UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LUCAS LANDRY, | ) | 1:24-cr-00018-SDN |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is Defendant Lucas Landry's motion to suppress (ECF No. 48). Mr. Landry is charged with one count of arson in violation of 18 U.S.C. § 844(i) (ECF No. 15). Mr. Landry moves to suppress statements he made to law enforcement during an interrogation on November 4, 2023, arguing the statements were taken without the benefit of *Miranda* warnings and involuntarily obtained, all in violation of his constitutional rights (ECF No. 48 at 1). The Court held a hearing on Mr. Landry's motion to suppress on June 27, 2025. For the reasons discussed below, I grant the motion in part with respect to a certain portion of Mr. Landry's statements, but otherwise deny the motion.

**I. Background**

The Indictment alleges Mr. Landry "maliciously damaged by means of fire the building and other real property" at the Bangor Walmart on about November 2, 2023.[1] Maine State Fire Marshal's Office Senior Investigator Edward Hastings investigated the scene and determined the fire started in the men's clothing section. Investigator Hastings

---

[1] The Indictment alleges the fire occurred "on about November 2, 2023," (ECF No. 15), and Investigator Hastings testified the fire occurred on Friday, November 3, 2023.

reviewed Walmart's security camera footage and observed an unidentified man approach a clothing rack, reach into the rack, remove his hands from the rack after thirty-eight seconds, and walk away. More than a minute later, smoke began emanating from the area and eventually flames became visible. Investigator Hastings observed that the unidentified man was the only person in the area during the time immediately prior to the fire's ignition.

Using Walmart's surveillance footage, Investigator Hastings observed the unidentified man enter a truck marked "Northeast Construction/Paving" ("Northeast") in the parking lot. Investigator Hastings contacted Northeast and showed Northeast's assistant manager a photo of the suspect unidentified man. The assistant manager identified the man as Mr. Landry. Investigator Hastings asked the assistant manager to refrain from reaching out to Mr. Landry about the investigation. On Saturday, November 4, 2023, Investigator Hastings and Bangor Police Department Detective Jordan Perry travelled to Mr. Landry's residence in Smyrna, Maine to interview him. The officers rode together in Investigator Hastings's assigned vehicle, a black unmarked Ford F-150 pickup truck. Investigator Hastings and Detective Perry were dressed in plain clothes for the interview and had their firearms in holsters; the firearms were hidden from view under their jackets and they did not touch their firearms during the interview.

When Investigator Hastings and Detective Perry arrived at Mr. Landry's residence, Mr. Landry's ex-wife Krista Landry, with whom he still lived, answered the door. Def.'s Mot. to Suppress, Ex. A, Nov. 4, 2023, Interview Tr. (ECF No. 48-1) at 1–3. Ms. Landry informed Investigator Hastings and Detective Perry that Mr. Landry was sleeping and inquired about the purpose of their visit. *Id*. at 2. The officers told her they "just want[ed] to chat with [Mr. Landry] for a second," and invited her to stand nearby and listen. *Id*. at

2

2–3. While waiting for Mr. Landry to come to the door, Ms. Landry informed the officers that the couple's eleven-year-old daughter was inside the home. *Id.* at 4. Mr. Landry came to the door about five minutes after the officers arrived. *Id.* Investigator Hastings began the interview at the entryway from outside the home while Detective Perry was standing about fifteen to twenty feet from the door on the dirt path that leads from the driveway to the door. Neither officer entered Mr. Landry's home during the course of the November 4, 2023, encounter.

When Mr. Landry arrived in the entryway, Investigator Hastings and Detective Perry identified themselves and their positions and stated they were "following up on an incident down at Walmart in Bangor." *Id.* at 5. The officers asked Mr. Landry if he could identify himself in photos taken from Walmart surveillance cameras, and he acknowledged he was the individual depicted in the photos. *See id.* at 5–6. After Mr. Landry acknowledged he was at Walmart the previous night and that he was the man in the photos, the officers stated they knew he had started the fire and had walked out of the store with a cart of unpaid merchandise, and asked Mr. Landry why he had done so. *Id.* at 7–8. Mr. Landry admitted he was in the clothing area "looking at jackets and things" and that he did not pay for "the stuff" but denied starting the fire. *Id.* at 8–10.

After Mr. Landry admitted to leaving the Walmart with unpaid merchandise, Ms. Landry interjected into the conversation. *Id.* at 10–11. Investigator Hastings suggested to Mr. Landry that the officers and Mr. Landry step away from the landing. *See id.* at 11 ("[L]et's walk over here."). Investigator Hastings did not demand Mr. Landry move locations, use physical force, or make any contact with Mr. Landry's person to move the interview to the driveway.

3

The officers continued questioning Mr. Landry in the driveway next to Mr. Landry's work truck. While the officers were discussing the importance of telling the truth with Mr. Landry, Mr. Landry stated the following about his background: "I was abused as a kid and hid it and, and never came clean about it and I lie . . . . It's something that I've changed—I've worked on changing for a lot of years now and I've come to that." *Id.* at 20.

During the interview, Detective Perry and Mr. Landry had the following exchange:

> [Detective Perry:] I wish it could've gone a little—I mean, I appreciate you willing to, to speak with us in general about it because you could've just said, you could've slammed the door and said, "I ain't talking to you." That's not the kind of person you are, okay?
>
> [Mr. Landry:] No.

*Id.* at 26. About thirty-two minutes into the interview, Investigator Hastings informed Mr. Landry,

> [Investigator Hastings:] Yeah, so listen, we're going to arrest you and bring you down to Bangor.
>
> [Mr. Landry:] Oh, for real?

*Id.* at 29. The officers then told Mr. Landry they would facilitate his arrest so it would not be obvious to his eleven-year-old daughter, and later allowed Mr. Landry to enter Investigator Hastings's truck in the front passenger seat and put him in handcuffs after he was inside. *Id.*

Soon after, but prior to entering the truck and being handcuffed, about thirty-five minutes into the interview, Investigator Hastings first mentioned to Mr. Landry that he would be given *Miranda* warnings. *Id.* at 32. For the next few minutes, Ms. Landry asked several questions and the officers tried to locate a working lighter so Mr. Landry could smoke a cigarette. *See id.* at 32–38. About forty-three minutes into the interaction Investigator Hastings told Mr. Landry, "I want to read you your *Miranda* warning

because . . . you're in custody at this point even though you're not in handcuffs." *Id.* at 38. The officers allowed Mr. Landry to smoke a cigarette and have a drink of water before requiring him to get into Investigator Hastings's truck, and they allowed Ms. Landry to keep the stolen Walmart items. The officers did not allow Mr. Landry's request to go say goodbye to his daughter, who was still inside the home, or allow Mr. Landry to go into the house to retrieve his wallet, but did allow Ms. Landry to grab it for him. *See id.* at 44.

About fifty-one minutes into the encounter, Mr. Landry got in the truck and Investigator Hastings gave Mr. Landry *Miranda* warnings. *Id.* at 46–47. During the approximately eighteen-minute period between when Investigator Hastings announced the arrest and provided Mr. Landy with the *Miranda* warnings, the officers continued to ask questions of Mr. Landry and Mr. Landry continued to respond. *See id.* at 29–47. After continuing to attempt to elicit incriminating responses from Mr. Landry, Detective Perry told Mr. Landry that all they wanted was "an explanation." *Id.* at 45. After Investigator Hastings read the *Miranda* warnings, Mr. Landry continued to engage in discussions with Investigator Hastings about the fire at Walmart. *See id.* at 47–77. At the end of the encounter as the officers were bringing Mr. Landry into the Penobscot County Jail, Mr. Landry told the officers, "[Y]ou've been very great, very good to me." *Id.* at 77. Mr. Landry did not admit to starting the fire at any point during the interview or during the ride to Bangor.

Mr. Landry is a forty-five-year-old man from Millinocket, Maine with a high school education. ECF No. 48 at 3. Most recently, he worked for a paving company and previously worked as a truck driver hauling wood. *Id.* He has one eleven-year-old daughter. *Id.* Mr. Landry experienced traumatic childhood sexual abuse by an extended

5

family member. *Id*. The abuse and trauma were largely unreported and wholly untreated. *Id*. Mr. Landry has a criminal history dating back to his mid-twenties. ECF No. 52 at 11.

## II. Discussion

Mr. Landry moves to suppress all statements he made to law enforcement on November 4, 2023, arguing he made the statements while he was in custody and without law enforcement giving him *Miranda* warnings, and that his statements were coerced, in violation of his Fifth Amendment right against compelled self-incrimination and *Miranda v. Arizona*, 384 U.S. 436 (1966). *See generally* ECF No. 48. The Government argues the Court should deny Mr. Landry's motion because he was not in custody prior to the time the officers announced Mr. Landry's arrest. ECF No. 52 at 5–9. The Government further argues Mr. Landry spoke voluntarily throughout the interview. *Id*. at 10–11.

*Miranda* warnings advise individuals of their constitutional rights and warn them of some of the consequences that may result from waiving those rights; the warnings must be given when a person is in custody. *United States v. Quinn*, 815 F.2d 153, 160 (1st Cir. 1987); *United States v. Melendez*, 228 F.3d 19, 21 (1st Cir. 2000). "The [*Miranda*] rule was devised to protect against the extraordinary danger of compelled self-incrimination that is inherent in [custodial interrogations]." *Melendez*, 228 F.3d at 21. Statements made by a person in custody who has not been given *Miranda* warnings generally are inadmissible. *United States v. Simpkins*, 978 F.3d 1, 9 (1st Cir. 2020). In contrast, *Miranda* warnings are not required absent a custodial interrogation. *Quinn*, 815 F.2d at 160.

The Court employs a two-step inquiry to determine whether a person is in custody and, therefore, requires *Miranda* warnings. "[F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a

reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (footnote omitted). Whether a person is in custody "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury v. California*, 511 U.S. 318, 323 (1994). In other words, the interrogating officer's uncommunicated subjective intent is irrelevant to the custody determination. *United States v. Hughes*, 640 F.3d 428, 435 (1st Cir. 2011). The First Circuit has identified four non-exclusive factors to assist a court's determination of whether an individual is in custody: "[W]hether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Id.* (quoting *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996)).

Unwarned statements made during custodial interrogations can "taint" later, warned statements as fruit of the poisonous tree "when police deliberately employ a two-step interrogation tactic designed to circumvent *Miranda* warnings." *United States v. Faust*, 853 F.3d 39, 48 (1st Cir. 2017). This deliberate tactic was used in *Missouri v. Seibert*, where police interrogated a suspect in custody without having given her *Miranda* warnings, during which time she made a crucial admission. *Missouri v. Seibert*, 542 U.S. 600, 604–05 (2004). After giving the suspect a twenty-minute break, the police then gave her the *Miranda* warnings and confronted her with her pre-warning statements to get her to repeat her confession. *Id.* at 605. A four-justice plurality held that the later *Miranda* warnings were ineffective and the post-warning statements were inadmissible under the circumstances. *Id.* at 611–14. Justice Kennedy, the fifth vote, endorsed a narrower test:

7

the police's use of the deliberate two-step approach presumptively taints the later, warned statements. *Id.* at 622 (Kennedy, J., concurring). The First Circuit has "not settled on a definitive reading of *Seibert*," *Faust*, 853 F.3d at 48 n.6, because it often concludes the result is the same under either approach, *United States v. Brougham*, No. 22-cr-00152-JAW-1, 2024 WL 249677, at *25 (D. Me. Jan. 23, 2024).

### A.   When Custody Began

Mr. Landry argues the entirety of the November 4, 2023, encounter with Investigator Hastings and Detective Perry should be suppressed because the interrogation was custodial from the outset. According to Mr. Landry, any statements he made before he was given *Miranda* warnings tainted the statements he made after his *Miranda* warnings were read and the later *Miranda* warnings were provided to "legitimize the prior, unlawful evidence acquisition." ECF No. 48 at 1. The Government argues *Miranda* warnings were not required until the officers informed Mr. Landry he was being arrested because he was not in custody until that point. ECF No. 52 at 5. Mr. Landry replies that he was in custody from the beginning of the November 4, 2023, encounter and the fact that the circumstances of the questioning environment were unchanged from the beginning of the encounter through the announcement of his arrest is evidence of the custodial nature of the whole encounter. Def.'s Reply in Support of Mot. to Suppress (ECF No. 55) at 1–2.

The Court first examines when Mr. Landry entered custody, as *Miranda* warnings are required only during custodial interrogations. *Quinn*, 815 F.2d at 160. Formal arrest is not dispositive of the issue of when custody begins. *See Berkemer v. McCarty*, 468 U.S. 420, 440–41 (1984). As laid out above, the determination that a suspect is in custody turns on whether, under the circumstances, "a reasonable person [would] have felt he or

8

she was not at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112. As explained, I look to the factors identified by the First Circuit to guide the determination of whether an interrogation is custodial. *Hughes*, 640 F.3d at 435.

Mr. Landry argues the fact that Investigator Hastings and Detective Perry did not tell him he was free to terminate the interview should weigh in favor of a finding he was in custody during the entire November 4, 2023, encounter. ECF No. 48 at 8–9. He cites two cases in support of this argument, *United States v. Hughes*, 640 F.3d 48 (1st Cir. 2011), and *United States v. Griffin*, 7 F.3d 1512 (10th Cir. 1993). ECF No. 48 at 8–9.

In *Hughes*, the First Circuit affirmed the district court's finding that Hughes was not in custody in circumstances quite similar to the facts of the case at hand. The factors weighing in favor of the district court's finding were as follows: the interview took place at Hughes's home; the officers did not invade Hughes's personal space; only two officers participated in the questioning; the officers did not take their weapons out of their holsters; no officer physically restrained Hughes or made any physical contact with him; the interview was relaxed and non-confrontational; the late-morning time of day of the interview was not menacing; Hughes was appropriately dressed; the officers were polite and did not raise their voices; and the interview was "relatively short" at ninety minutes with a twenty minute break for an EMT to attend to Hughes's panic attack. *Hughes*, 640 F.3d at 435–37. Factors weighing in favor of a custody determination were that the officers accompanied Hughes outside to smoke a cigarette and that the officers took Hughes into protective custody at the end of the interview. *Id.* at 436–37. The First Circuit upheld the district court's finding that Hughes was not in custody for the interview under the totality of the circumstances test. *Id.* at 437.

In *Griffin*, police separated the suspect from her travel companion and detained her in a small private office within a police-controlled area of an airport. *Griffin*, 7 F.3d at 1519. Griffin was not told she could refuse to answer questions or terminate the interview, and her only means of exiting the room would require her to go around the police. *Id*. In that case, the Tenth Circuit concluded a reasonable person would have understood themselves to be in custody. *Id*.

Here, the totality of the circumstances aligns almost exactly with those present in *Hughes*, is dissimilar from the circumstances in *Griffin*, and supports the conclusion that Mr. Landry was not in custody until Investigator Hastings told him, "[W]e're going to arrest you." ECF No. 48-1 at 29. Like in *Hughes*, the November 4, 2023, interview occurred at Mr. Landry's home, in his doorway and in his driveway, during midday hours. The officers never laid hands on Mr. Landry until after they informed him that he was in custody, nor did they ever remove their weapons from their holsters. The officers allowed Mr. Landry time to get dressed before he came to the door to speak with them; they never raised their voices. Indeed, Mr. Landry himself acknowledged the officers were polite, stating at the end of the encounter, "[Y]ou've been very great, very good to me." *Id*. at 77. Additionally, the interview was relatively short—the officers informed Mr. Landry they were arresting him around thirty-two minutes into the encounter. Unlike in *Griffin*, Mr. Landry was not separated from Ms. Landry for the interview; rather, she was allowed to stand with him in the doorway and continued to lurk nearby after the officers and Mr. Landry moved into the driveway. Although the officers never explicitly informed Mr. Landry he was free to terminate the interview or refuse questions, they did tell him that they were appreciative of the fact that he was "willing to, to speak with us in general about it" and that he "could've slammed the door and said, 'I ain't talking to you.' That's not the

kind of person you are, okay? [Mr. Landry:] No." *Id.* at 26. And while the test is an objective and not subjective one, the fact that Mr. Landry himself seemed surprised when the officers told him he was being arrested further supports the lack of custodial indicators. *See id.* at 29 ("[Investigator Hastings:] Yeah, so listen, we're going to arrest you and bring you down to Bangor. [Mr. Landry:] Oh, for real?").

Mr. Landry argues his entire encounter with law enforcement was custodial as demonstrated by the fact that circumstances of the interview remained unchanged until Investigator Hastings informed Mr. Landry that he was under arrest. Before Investigator Hastings told Mr. Landy he would be arrested, the officers' uncommunicated subjective intent to arrest Mr. Landry on November 4, 2023, is irrelevant to the question of whether he was in custody. *Hughes*, 640 F.3d at 435. After examining the totality of the circumstances, I conclude Mr. Landry was not in custody until the officers informed him that he was going to be arrested. Because Mr. Landry was not in custody from the beginning of the interview until that point, the officers were not required to give him *Miranda* warnings during that period. Therefore, I need not suppress his pre-custody statements.

Once Investigator Hastings told Mr. Landry he would be arrested, the interrogation turned custodial. The government seems to concede this, ECF. No 52 at 9 ("The defendant was not in custody until he was told he was under arrest . . . ."), and for good reason: A reasonable person, told by police officers that they were going to be arrested, would not have felt "at liberty to terminate the interrogation and leave." *Thompson*, 516 U.S. at 112; *see Stansbury*, 511 U.S. at 325. Indeed, here Mr. Landry immediately *confirmed* that the officers intended to arrest him. ECF No. 48-1 at 29 ("[Investigator Hastings:] [W]e're going to arrest you and bring you down to Bangor. [Mr.

11

Landry:] Oh, for real? [Investigator Hastings:] Yup, for real. . . . [Mr. Landry:] Oh, my god. For real, guys? [Investigator Hastings:] Yup. Yup. . . . [Investigator Hastings:] I'm going to pull my truck over here to the side so you can get in the front passenger seat with me, *we'll put some handcuffs on*, and take a ride down to the jail." (emphasis added)). The totality of the circumstances demonstrate that Mr. Landry was in custody at the point the law enforcement officers told him they were going to arrest him.

However, eighteen-minutes elapse between when Investigator Hastings told Mr. Landry he would be arrested and when Investigator Hastings finally read Mr. Landry the *Miranda* warnings. During that period, Mr. Landry was in custody and was not given *Miranda* warnings. Nonetheless, law enforcement continued to interrogate Mr. Landry and he continued to respond. Because Mr. Landry's statements were obtained during this intervening period in violation of *Miranda*'s prophylactic warning rule, this portion of Mr. Landry's statements must be suppressed. Specifically, Mr. Landry's statements between when Investigator Hastings says, "Yeah, so listen, we're going to arrest you and bring you down to Bangor," *id.* at 29, 33:08, and when Investigator Hastings says, "And you know you don't have to say anything to us. Uh, totally voluntary on your part if you decide to[,]" *id.* at 47, 51:30, are suppressed.

Still, the inadmissibility of those intervening statements does not taint Mr. Landry's post-warning statements under *Missouri v. Seibert*. While the intervening statements "should not have been taken without a warning," nothing indicates the police "intend[ed] to use them to extract later post-warning information *or* that the later warnings were rendered ineffective by the earlier questions." *United States v. Widi*, 684 F.3d 216, 221–22 (1st Cir. 2012). Rather, the delay between when Investigator Hastings announced Mr. Landry's arrest and when Investigator Hastings gave the *Miranda*

12

warnings appears inadvertent. *See* ECF No. 48-1 at 29–47. In fact, Investigator Hastings attempted to read Mr. Landry his *Miranda* warnings two times during the intervening period, but Mr. Landry cut him off both times, including when he asked if handcuffs would be necessary. *See id.* at 32, 38. Most significantly, after Investigator Hastings gave Mr. Landry his *Miranda* warnings, the officers did not confront Mr. Landry with his statements made during the unwarned time he was in custody to attempt to get him to repeat them or otherwise use any deliberate tactics to skirt *Miranda*'s requirements.[2] *See Seibert*, 542 U.S at 605, 611–14, 622. Accordingly, Mr. Landry's post-warning statements are admissible notwithstanding the *Miranda* violation.

## B.  Coercion

Mr. Landry argues his statements should be suppressed because they were coerced and not voluntary. ECF No. 48 at 12. The Government responds that Mr. Landry's statements were not coerced because the initial interview was non-custodial, the questioning was not aggressive or abusive, there was no deprivation of essentials, and nothing about the interview or Mr. Landry renders his susceptibility for coercion irrefutable. ECF No. 52 at 10–11. Mr. Landry insists the interview was confrontational, accusatorial, and tense, and that the officers were aware that Mr. Landry suffered psychological trauma.

---

[2] After reading Mr. Landry the *Miranda* warnings, Investigator Hastings briefly mentioned that he was going to write in his incident report that Mr. Landry used the Bic lighter he said he had on his person the day before to start the fire, referencing Mr. Landry's earlier admission that he had the specific Bic lighter on his person the day of the fire. *See* ECF No. 48-1 at 9, 49. During the eighteen-minute period Mr. Landy was in custody but had not yet been read *Miranda* warnings, Investigator Hastings asked Mr. Landry to give him the Bic lighter he had on the day of the fire, and Mr. Landry again acknowledges he had that Bic lighter on his person on the day of the fire. *See id.* at 31. As stated, these statements are suppressed. However, Mr. Landry had already admitted to possession of that Bic lighter on the day of the fire before he was in custody, dissolving any potential taint of making the same admission during the time he was in custody but had not yet been provided *Miranda* warnings.

13

Many of the factors for determining the voluntariness of statements overlap with the factors for determining whether a suspect is in custody. Courts look to "the totality of the circumstances, including both the nature of the police activity and the defendant's situation." *Hughes*, 640 F.3d at 438. Relevant factors include "the length and nature of the questioning, any promises or threats made, and any deprivation of essentials (e.g., food, water, sleep, bathroom facilities) imposed upon the suspect[,] . . . [and] an appraisal of the defendant's attributes, such as his age, education, intelligence, and mental state." *Id*. "A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness." *United States v. Rojas-Tapia*, 446 F.3d 1, 7 (1st Cir. 2006).

The same factors that demonstrate that Mr. Landry was not in custody demonstrate he was not coerced. The length of the questioning was relatively short; the entirety of the encounter lasted just under two and a half hours, with one and a half hours occurring in the truck on the way to Bangor after Mr. Landry's arrest. Although the officers approached the questioning from the assumption that Mr. Landry started the fire and were seeking only details about the crime, the nature of the questioning was not overly harsh or abusive. The officers did not make any promises or threats, nor did they deprive Mr. Landry of any essentials during the encounter. To the contrary, they allowed Mr. Landry to smoke a cigarette and have a drink of water before discreetly completing the arrest out of view of Mr. Landry's eleven-year-old daughter. Although Mr. Landry made the officers aware of his history of trauma, the defendant's susceptibility to coercion alone cannot render his statements involuntary in the absence of police overreach. *See Rojas-Tapia*, 446 F.3d at 7 ("A defendant's mental state or condition, by itself and apart

14

from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness."). Mr. Landry's statements were not coerced.

Similarly, the evidence further shows that Mr. Landry voluntarily waived his *Miranda* rights. *See United States v. Jackson*, 918 F.2d 236, 241 (1st Cir. 1990). Upon examination of the totality of the circumstances, I do not find that the officers used coercive tactics to force Mr. Landry to continue discussing the fire after he received *Miranda* warnings. *See United States v. Palmer*, 203 F.3d 55, 60 (1st Cir. 2000) ("To determine the voluntariness of a waiver, it is necessary to look at the totality of the circumstances, including 'the tactics used by the police, the details of the interrogation, and any characteristics of the accused that might cause his will easily to be overborne.'" (quoting *United States v. Rohrbach*, 813 F.2d 142, 144 (8th Cir. 1987))). In fact, Investigator Hastings told Mr. Landry any further statements he made would be "totally voluntary on your part," which Mr. Landry acknowledged. ECF No. 48-1 at 47.

### III. Conclusion

For these reasons, I GRANT IN PART Mr. Landry's motion to suppress (ECF No. 48) with respect to Mr. Landry's statements between when Investigator Hastings says, "Yeah, so listen, we're going to arrest you and bring you down to Bangor," and when Investigator Hastings says, "And you know you don't have to say anything to us. Uh, totally voluntary on your part if you decide to[]" and otherwise DENY the motion.

**SO ORDERED.**

Dated this 24th day of July, 2025.

/s/ Stacey D. Neumann
**UNITED STATES DISTRICT JUDGE**